14 F.3d 173
 43 Soc.Sec.Rep.Ser. 359, Medicare&Medicaid Guide P 42,065
Marion SKANDALIS, Individually and on Behalf of all persons
similarly situated; Raymond Rondina, Individually
and o/b/o all persons similarly
situated, Plaintiffs-Appellees,
Philip Sharko, Sr.; Catherine Ann Sigler; Stephen
Chakalinsky; Lucy Dyer, Intervenor-Plaintiffs-Appellees,
v.
Audrey ROWE, In her capacity as Commissioner of Connecticut
Department of Income Maintenance, Defendant-Appellant.
 No. 1932, Docket 93-7352.
 United States Court of Appeals,
Second Circuit.
 Argued Sept. 22, 1993.
Decided Jan. 18, 1994.
 
 Hugh Barber, Asst. Atty. Gen., Hartford, CT (Richard Blumenthal, Atty. Gen., Richard J. Lynch, Marianne I. Horn, Asst. Attys. Gen., of counsel) for defendant-appellant.
 Sheldon V. Toubman, New Haven Legal Assistance Ass'n, New Haven, CT (Maxwell Gould, New Haven Legal Assistance Association, New Haven, CT, Hilary Sohmer Dalin, Connecticut Legal Services, Inc., Willimantic, CT, of counsel) for plaintiffs-appellees.
 Before: VAN GRAAFEILAND, WALKER and JACOBS, Circuit Judges.
 JACOBS, Circuit Judge:
 The Medicaid Act allows states at their option to seek a federal waiver of certain statutory rules in order to underwrite home care not normally reimbursable under Medicaid for particular groups of people for whom such care would be cheaper than the institutional care that they otherwise need. 42 U.S.C. Secs. 1396a(a)(10)(A)(ii)(VI) and 1396n(c) (1988). The State of Connecticut exercised that option and, pursuant to the terms of the federal waiver it sought, has been paying the home care costs of such people who are over 65 and whose income is below a designated threshold. Plaintiffs-appellees represent a class composed of Connecticut residents over 65 whose income exceeds the threshold specified in the waiver but who would qualify for Medicaid if they were paying for the level of institutional care that they need rather than receiving such care from their families at home. Defendant-appellant, the Commissioner of the Connecticut Department of Income Maintenance ("Connecticut"), appeals from an order of the United States District Court for the District of Connecticut (Dorsey, J.) holding as a matter of statutory construction that the state cannot refuse benefits under the waiver program to the plaintiff class.
 
 
 1
 We reverse.
 
 BACKGROUND
 
 2
 This appeal requires us to construe certain provisions of the Medicaid Act, 42 U.S.C. Sec. 1396 et seq. (1988 & Supp. III 1991) (the "Act"). Medicaid is a cost-sharing arrangement under which the federal government reimburses a portion of the expenditures incurred by states that elect to furnish medical assistance to individuals whose income and resources are insufficient to cover the costs of their medical care. The Act is administered by the Secretary of the Department of Health and Human Services (the "Secretary").
 
 
 3
 Generally, Medicaid eligibility depends on a strict financial means test. People who are institutionalized can ordinarily satisfy the Medicaid means test for income on the basis of their income net of the costs of institutionalization. The Act authorizes the Secretary to grant a Home and Community Based Waiver ("waiver") that permits states, at their option, to provide home or community-based services to certain individuals who would otherwise require nursing home or other institutional care. 42 U.S.C. Secs. 1396a(a)(10)(A)(ii)(VI) and 1396n(c). (For convenience we refer to these services as "home care.") To receive federal reimbursement under a waiver program, a state must submit a waiver proposal to the Secretary, and obtain her approval. As a condition to approval, the state must demonstrate that home care will cost less than institutional care. 42 U.S.C. Sec. 1396n(c)(2)(D).
 
 
 4
 Connecticut operates a federally-approved waiver program known as the Connecticut Home Care Program for Elders ("CHCPE"). See Conn.Gen.Stat. Sec. 17-314b. Connecticut limits eligibility for this program to those individuals with income below 300% of the federal grant for Supplemental Security Income ("SSI"). Although the Act permits a state to extend Medicaid coverage to individuals with income exceeding this limit if their income is nevertheless insufficient to cover their medical expenses, and although such individuals are included in Connecticut's general Medicaid plan, Connecticut has designed its home-care waiver program in a way that excludes them.
 
 
 5
 Plaintiffs are individuals excluded from Connecticut's waiver program because their incomes are greater than 300% of SSI, but who require a level of care that justifies institutionalization and who would be eligible for Medicaid if they actually were institutionalized. The plaintiffs therefore face a harsh dilemma: either to remain at home, relying on their own resources or imposing on their families the burdens of care necessary to allow them to live outside a nursing home, or to enter a nursing home (which they strongly wish to avoid) and become eligible for Medicaid assistance. They claim that the Act does not permit Connecticut to operate a waiver program--or the Secretary to approve one--that excludes them solely because their incomes are above 300% of SSI.
 
 A. Statutory Framework
 
 6
 The Medicaid program was created in 1965 "for the purpose of providing federal financial assistance to States that choose to reimburse certain costs of medical treatment for needy persons." Harris v. McRae, 448 U.S. 297, 301, 100 S.Ct. 2671, 2679, 65 L.Ed.2d 784 (1980). To participate in the Medicaid program, a state must obtain approval for its Medicaid plan from the Secretary. Once this approval is granted, the federal government will reimburse the state for a portion of the expenditures made under the state plan.
 
 
 7
 The Act makes federal funds available to pay for "medical assistance" provided under state plans approved by the Secretary. 42 U.S.C. Sec. 1396. The term "medical assistance" is defined in Sec. 1396d(a) to include the full range of services and beneficiaries that a state may choose to cover in its plan. "Medical assistance", for our purposes, includes nursing care, see Sec. 1396d(a)(4)(A), and home or community-based services for which a waiver is required, see Sec. 1396n(c)(4)(B), rendered to specified groups of beneficiaries, including persons "65 years of age or older." Sec. 1396d(a)(iii).
 
 
 8
 States participating in the Medicaid program are required to provide coverage to certain groups, and are given the option to extend coverage to various other groups. The line between mandatory and optional coverage is primarily drawn in Sec. 1396a(a): mandatory coverage is specified in Sec. 1396a(a)(10)(A)(i), and the state options are set forth in subsection (ii). The groups specified in these sections are collectively referred to by the initiated as the "categorically needy." In addition, a state may elect to cover a group of individuals known as the "medically needy." The medically needy are people whose incomes exceed the limit set for the categorically needy, but who become eligible for Medicaid, if the state elects to cover them, by incurring medical expenses in an amount sufficient to reduce their gross incomes to the "medically needy income level" set by the state. See 42 C.F.R. Secs. 435.1(b)(3)(i), 435.301. Under Sec. 1396a(a)(10)(A)(ii), a state may elect to treat, as categorically needy, individuals in one or more specified groups (e.g., the aged, the blind)
 
 
 9
 who would be eligible under the State plan under this subchapter if they were in a medical institution, with respect to whom there has been a determination that but for the provision of [home care services under a waiver] they would require the level of care provided in a hospital, nursing facility or intermediate care facility for the mentally retarded the cost of which could be reimbursed under the State plan, and who will receive home or community-based services pursuant to a waiver granted by the Secretary....
 
 
 10
 42 U.S.C. Sec. 1396a(a)(10)(A)(ii)(VI) (emphasis added).
 
 
 11
 As the statute recites, a state program for home care coverage requires a waiver by the Secretary. The waiver program for home care is governed by 42 U.S.C. Sec. 1396n(c).[1] States seeking a waiver must submit a proposal prepared in accordance with regulations promulgated by the Secretary. See 42 C.F.R. Secs. 435.217, 441.180 and 441.300 et seq. (1992). The statute requires that the provision of such services be cost-effective for the Medicaid program. 42 U.S.C. Sec. 1396n(c)(2)(D). The waiver request must give adequate assurance as to the per capita cost-effectiveness of the waiver plan for the beneficiary population.[2] The state is required to supplement that assurance with documentation explaining how the state estimated the per capita expenditures. 42 C.F.R. Sec. 441.303(f). The Secretary may not approve the state plan unless the assurances are "satisfactory to the Secretary." 42 U.S.C. Sec. 1396n(c)(2).
 
 B. Connecticut's Waiver Program
 
 12
 Connecticut obtained the Secretary's approval for its waiver program, CHCPE, in 1986. CHCPE is designed to provide home care for individuals who are at least 65 years of age, and who would require nursing facility care if not provided with services under the waiver. In addition to the age and medical need requirements, Connecticut's program imposes a financial eligibility standard which limits coverage to individuals who have monthly income below 300% of SSI. At the time this action was commenced, 300% of SSI was $1,266 per month.
 
 
 13
 In October 1990, the Secretary approved Connecticut's request for a five-year renewal of its waiver program, subject to Connecticut's agreement to limit its program to a specified number of beneficiaries: 2,938 in the first year, rising incrementally to 7,664 in the fifth year. The Secretary's approval letter recited that "the waiver request, and the additional clarifying information the State provided us, conforms fully to the requirements of the statute and Medicaid regulations."C. Named Plaintiffs
 
 
 14
 The facts concerning the personal and family circumstances are drawn from the pleadings and are not in dispute.
 
 
 15
 Marion Skandalis and Raymond Rondina are Connecticut citizens over 65 years of age. Mrs. Skandalis, a widow living in her daughter's home, has a $1307 monthly income--$41 over the waiver program's income limit in effect at the time plaintiffs filed their complaint. She has had several strokes and requires laborious care and constant attention. Her family members perform the burdens of caring for her in their home, because the alternative is to place her in a nursing home. If Mrs. Skandalis actually were institutionalized, however, her income would not meet her nursing home costs and, upon spending down to the current monthly medically needy income level of $473.48, she would qualify for assistance under Connecticut's state Medicaid plan.
 
 
 16
 Raymond Rondina is 69 years old and lives with his wife and mother-in-law. His monthly income is $1352--$86 over the income limit in effect at the time plaintiffs filed their complaint. He has suffered a stroke, and his wife provides all necessary care for him, as well as for her mother. These demands are impairing Mrs. Rondina's own health; yet she is undertaking to do all she can to avoid placing her husband in a nursing home. If Mr. Rondina were institutionalized, his income would be insufficient to meet the costs of care, and, like Mrs. Skandalis, he would become eligible for Medicaid assistance.
 
 
 17
 Both Mrs. Skandalis and Mr. Rondina applied for CHCPE services. Both were rejected solely because their incomes exceeded 300% of SSI.
 
 D. Procedural History
 
 18
 Mrs. Skandalis and Mr. Rondina filed a Complaint on December 26, 1991, individually and on behalf of a putative class. Plaintiffs moved for preliminary injunctive relief, which the district court granted. The Complaint as amended alleges that the Act does not permit Connecticut to exclude persons with incomes in excess of 300% of SSI from the waiver program, because Sec. 1396a(a)(10)(A)(ii)(VI) requires CHCPE to cover all persons over 65 years of age who would be eligible for Medicaid if institutionalized, so long as CHCPE services would be less expensive than institutional nursing care.
 
 
 19
 The parties filed cross-motions for summary judgment. Connecticut admitted that plaintiffs were excluded from CHCPE solely because they failed to meet the program's financial eligibility test. Connecticut denied, however, that the Act requires its waiver program to include all individuals over 65 who would be eligible for Medicaid if institutionalized. The district court invited the Secretary to file a brief amicus curiae presenting her interpretation of the Act. The Secretary's amicus brief stated that nothing in the Act requires Connecticut to cover the medically needy under its waiver program, and that both the structure of the Act and its legislative history support the view that Congress intended to permit the states substantial flexibility in designing their waiver programs.
 
 E. The District Court's Opinion
 
 20
 On January 13, 1993, the district court granted plaintiffs' motion for summary judgment, 811 F.Supp. 782. As a matter of statutory interpretation, the district court concluded that the Act "provides no basis for denial of participation in [CHCPE] to a group based on the manner in which they qualify for Medicaid." Although Connecticut could elect to cover or exclude from its waiver program any group listed in Sec. 1396d(a)--in particular, individuals over 65--the district court held that the state could not exclude sub-categories of persons in those groups (such as the plaintiff class of people older than 65 whose income exceeds 300% of SSI), unless specifically authorized to do so by the statute.
 
 
 21
 The court rejected as unreasonable Connecticut's proffered justification for its financial eligibility test. Connecticut argued that people with incomes above 300% of SSI, as compared with poorer people requiring similar levels of care, are marginally more likely to arrange for home care without financial assistance by the state. The district court found that argument untenable, given the relevant population of people potentially eligible for waivered home care. The court concluded it was unreasonable to force the class members to choose between entering a nursing home or shouldering (with their families) the unsubsidized costs and unassisted burdens of home care. Since the state agency's view (shared by the Secretary and set out in her amicus brief) was, in the district court's opinion, incompatible with the statutory language and economically counterproductive, the district court determined that the agency's view was "not sufficiently reasonable," and therefore not entitled to deference.
 
 
 22
 Shortly after the ruling on summary judgment, the district court granted plaintiffs' motion for class certification.
 
 
 23
 Judgment was entered in favor of plaintiffs and the class on March 17, 1993. The judgment ordered Connecticut to begin processing applications for waiver services from class members (determining eligibility by subtracting from income the average Medicaid reimbursement rate for nursing facilities if the applicant had not been accepted at a specific facility) and to provide notice of the available services to potential applicants (including posters in nursing facilities and senior centers). The judgment also required Connecticut to file a new application with the Secretary, seeking a modification of the federal waiver that would bring the waiver into compliance with the district court's construction of the Act.
 
 
 24
 In compliance with the court's order, Connecticut requested an amendment to CHCPE to allow services to be provided to the members of the plaintiff class. By letter dated September 13, 1993, the Secretary informed Connecticut that its request could not be approved as submitted, but suggested three alternatives by which Connecticut might make the plaintiff class eligible to receive CHCPE services.
 
 F. The Appeal
 
 25
 On appeal, Connecticut contends that the district court erred (a) in ruling that the Act forbids Connecticut from excluding the class from its waiver program, and (b) in failing to give appropriate deference to the Secretary's interpretation of the Act. Since we reverse on those grounds, we do not address Connecticut's attack on the nature and scope of the relief afforded by the judgment, or other grounds of appeal.
 
 ANALYSIS
 
 26
 The sole and determinative issue of statutory construction on this appeal is whether the Act permits Connecticut to exclude the medically needy from its home care waiver program. The Secretary interprets the Act as giving states substantial flexibility in designing its Medicaid programs, including the freedom to exclude the medically needy from a state waiver program under Sec. 1396n(c). The first step is therefore to consider the scope of deference owed to the Secretary's opinion.
 
 A. Deference Principles
 
 27
 An agency's interpretation of a statute that the agency administers is entitled to considerable deference; a court may not substitute its own reading unless the agency's interpretation is unreasonable. Chemical Manufacturers Ass'n v. Natural Resources Defense Council, Inc., 470 U.S. 116, 125, 105 S.Ct. 1102, 1107, 84 L.Ed.2d 90 (1985); Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984). When an agency construes its own regulations, such deference is particularly appropriate, Lyng v. Payne, 476 U.S. 926, 939, 106 S.Ct. 2333, 2341, 90 L.Ed.2d 921 (1986); United States v. Larionoff, 431 U.S. 864, 872, 97 S.Ct. 2150, 2155, 53 L.Ed.2d 48 (1977); Udall v. Tallman, 380 U.S. 1, 16-17, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965), and even more appropriate where, as here, we consider a small corner of a labyrinthine statute. See Lewis v. Grinker, 965 F.2d 1206, 1220 (2d Cir.1992); DeJesus v. Perales, 770 F.2d 316, 327 (2d Cir.1985). In this case, the Secretary has advanced her interpretation of the Act and of the regulations that Congress has authorized her to promulgate. See 42 U.S.C. Sec. 1302. Therefore, our role is to determine, first, "whether Congress has directly spoken to the precise question at issue." Chevron, 467 U.S. at 842, 104 S.Ct. at 2781. If so, we must "give effect to the unambiguously expressed intent of Congress." Id. at 843, 104 S.Ct. at 2781. If, on the other hand, the statute is silent or ambiguous, "we must defer to the agency's resolution of the matter if it is based on a permissible construction of the statute and is 'sufficiently reasonable.' " Detsel v. Sullivan, 895 F.2d 58, 62 (2d Cir.1990) (citing Chevron, 467 U.S. at 844-45, 104 S.Ct. at 2782-83).
 
 
 28
 The plaintiffs urge that deference is inappropriate in this case because the Secretary's interpretation is expressed in the context of litigation. In Lewis v. Grinker, 965 F.2d 1206, 1220 (2d Cir.1992), we acknowledged that when an agency takes a position during litigation that is inconsistent with the agency's earlier position we may consider that as a factor in determining whether deference is appropriate. Here, however, the Secretary's position is neither tactical nor inconsistent. The Secretary is not a party to this action (although there is reason to think she should have been), she filed her brief at the court's request, and she has advanced a position that she has held and implemented consistently over time. See, e.g., 42 C.F.R. Sec. 441.301(b)(6) (state's waiver request must be "limited to one of the following target groups or any subgroup thereof that the State may define: (i) aged or disabled, or both...." (emphasis supplied)); 50 Fed.Reg. 10,013 (Mar. 13, 1985) (commentary to regulations explaining that "a State can choose to provide home and community-based services to a limited group of eligibles...."). The fact that the Secretary reiterates her position in an amicus brief does not render the deference principles of Chevron inapplicable.
 
 B. The Statutory Language
 
 29
 Section 1396a(a)(10)(A)(ii)(VI) provides that a state has the option of providing Sec. 1396n(c) waiver services "to any group or groups of individuals described in section 1396d(a)" who would be eligible for Medicaid in the state if institutionalized "and who will receive home or community-based services pursuant to a waiver granted by the Secretary under subsection [1396n](c)...." The "group or groups of individuals described in Sec. 1396d(a)", referred to above, are listed in ten subsections, and include persons "65 years of age or older." 42 U.S.C. Sec. 1396d(a)(iii). The relevant clauses of Sec. 1396a, with emphasis supplied on the disputed language, are as follows:
 
 
 30
 (a) A state plan for medical assistance must--
 
 
 31
 * * * * * *
 
 
 32
 (10) provide--
 
 
 33
 (A) for making medical assistance available ... to--
 
 
 34
 (i) all individuals [in enumerated categories of assistance, including recipients of AFDC and SSI];
 
 
 35
 (ii) at the option of the State, to any group or groups of individuals described in section 1396d(a) of this title (or, in the case of individuals described in section 1396d(a)(i) of this title, to any reasonable categories of such individuals) who are not individuals described in clause (i) of this subparagraph but--
 
 
 36
 * * * * * *
 
 
 37
 (VI) who would be eligible under the State plan under this subchapter if they were in a medical institution, with respect to whom there has been a determination that but for the provision of home or community-based services described in subsection (c), (d), or (e) of section 1396n of this title they would require the level of care provided in a hospital, nursing facility or intermediate care facility for the mentally retarded the cost of which could be reimbursed under the State plan, and who will receive home or community-based services pursuant to a waiver granted by the Secretary under subsection (c), (d), or (e) of section 1396n of this title....
 
 
 38
 In its waiver program, Connecticut elected to cover persons "65 years of age or older," as permitted under Sec. 1396d(a)(iii).
 
 
 39
 The district court found that the plaintiffs were persons described by Sec. 1396a(a)(10)(A)(ii)(VI), who therefore would be entitled to coverage if Connecticut exercised its option to cover the group to which plaintiffs belong (i.e., persons "65 years of age or older"). The Act, according to the district court, gives Connecticut the option of providing waiver services to all or to none of the individuals in a Sec. 1396d(a) group, but does not allow the state to operate a program covering only a subset of a group absent express authority granted elsewhere in the statute. The district court reviewed provisions that contemplate subcategorization on the basis of a specific illness or condition, Sec. 1396n(c)(7), or place of residence, Sec. 1396n(c)(3), as well as a provision allowing the imposition of a numerical cap on the total number of beneficiaries, Sec. 1396n(c)(9) and (10); but, as the district court noted, the Act does not expressly permit states to exclude group members on the basis of whether their income exceeds 300% of SSI. The court reasoned that if Connecticut had such discretion to define the scope of its waiver program, Sec. 1396a(a)(10)(A)(ii)'s reference to Sec. 1396d(a) and the groups specified in that section would be "purposeless." Moreover, since Sec. 1396a(a)(10)(A)(ii) expressly permits states to extend coverage "to any reasonable categories" of individuals in the Sec. 1396d(a) group composed of persons "under the age of 21, or, at the option of the State, under the age of 20, 19, or 18 as the State may choose," 42 U.S.C. Sec. 1396d(a)(i), the district court concluded that Congress intended no subcategorization of groups designated in unitary terms, such as persons "65 years of age or older."
 
 
 40
 Finally, this appeal requires us to construe the language in Sec. 1396a(a)(10)(A)(ii)(VI), permitting services to be provided to persons who "would receive [home care] pursuant to a waiver," and the Sec. 1396n(c) requirement that states provide a medical evaluation for individuals who "may be eligible for [home care] under such waiver." By virtue of these clauses, Connecticut contends that no one has a right to waivered services except pursuant to an approved waiver, i.e., that the scope of a waiver granted by the Secretary defines the scope of coverage Connecticut is obligated to provide. The district court construed these clauses to mean only that the state must obtain the Secretary's approval for a waiver applicable to all persons statutorily entitled to coverage.
 
 
 41
 The Secretary construes Sec. 1396d(a) as merely describing the characteristics of individuals whom a state may cover under a waiver program, and as in no way limiting states to the option of including or excluding an entire group. The Secretary construes the language "pursuant to a waiver," 1396a(a)(10)(A)(ii)(VI), and "under such waiver," 1396n(c)(2)(B)(iii), to mean that eligibility is to be determined by reference to the terms of a specific waiver program, which a state has considerable latitude to define.
 
 
 42
 These clauses of the Act are not self-construing. Since both constructions find support in the text of the Act, in its supposed objectives, and in its overall design, we must adopt the Secretary's interpretation unless it is not "sufficiently reasonable." Detsel, 895 F.2d at 62. Section 1396a(a)(10)(A)(ii)(VI) does not explicitly require states to cover an entire 1396d(a) group in its waiver program. It may reasonably be read as describing the broadest categories of individuals that a state may cover, while allowing the category of individuals a state chooses to cover to be further defined by reference to an approved waiver plan. True, states are expressly permitted to provide services to "reasonable categories" of the group specified in 1396d(a)(i)--those under the age of 21, 20, 19, or 18--and may thus determine an age limit for eligibility. But this language neither permits nor forbids any further line-drawing. It reveals no evident Congressional design to permit the exclusion of 21-year olds who would qualify as medically needy, but to mandate the inclusion of medically needy people who are over 65. There is sufficient ambiguity in the statute to compel deference to the Secretary's interpretation, if it is reasonable.
 
 C. The Secretary's Construction
 
 43
 When, as here, Congress has not spoken to the precise question at issue, we must determine "whether the agency's answer is based on a permissible construction of the statute." Chevron, 467 U.S. at 843, 104 S.Ct. at 2781. The Secretary's construction, while not inevitable, is certainly reasonable when considered in terms of the Act's language and overall design, and in terms of the economic policy choices underlying the Connecticut home care waiver program.
 
 1. Statutory Design
 
 44
 The Act is designed to encourage states to participate in Medicaid by freeing them to adapt their programs to local conditions, and to develop effective approaches to health care through innovation and experiment. The Secretary has been careful not to impose too many restrictions on a state's ability to adopt waiver programs, since the Department of Health and Human Services "believe[s] that Congress intended to give the States maximum flexibility in operating their waiver programs. We expect this flexibility to foster initiative and to encourage States to administer cost-effective programs that meet specific local needs." 50 Fed.Reg. at 10,021. Congress itself has expressed concern that, if states are denied the flexibility to limit eligibility for their Medicaid programs, states may withdraw from Medicaid altogether. See Schweiker v. Hogan, 457 U.S. 569, 581-82 n. 18, 102 S.Ct. 2597, 2605 n. 18, 73 L.Ed.2d 227 (1982).
 
 
 45
 State participation in the Sec. 1396n(c) waiver program is entirely voluntary. Unlike the Medicaid program itself, which requires participating states to provide certain services to "all individuals" who fall into the group of the mandatory categorically needy, 42 U.S.C. Sec. 1396a(a)(10)(A)(i), the waiver program expressly contemplates a waiver of the "comparability" requirement (so that individuals within the program may receive varying levels of service), 42 U.S.C. Sec. 1396n(c)(3), a waiver of the "statewideness" requirement (so that a resident of Bridgeport may receive services that a resident of New Haven may not), id., and an absolute cap on the number of beneficiaries, 42 U.S.C. Sec. 1396n(c)(10). The statutory sanction for such seemingly arbitrary coverage limitations makes more plausible (rather than, as the district court found, unreasonable) the Secretary's view that states are free to exclude the medically needy from its waiver program. While the subsections of Sec. 1396n(c) cited by the district court recognize that states have line-drawing ability in some specific respects, those subsections do not support the view that line-drawing in other respects (such as on the basis of income) is thereby forbidden.[3] However appalling the consequences may be to particular Medicaid claimants, the Act authorizes a variety of harsh distinctions, which may result in disparate treatment of individuals having similar or identical needs. Certainly no broad or categorical entitlement can be deemed secured under a program that allows a state to impose a limit of as few as 200 people on the total number of participants. 42 U.S.C. Sec. 1396n(c)(10).
 
 
 46
 The Secretary's regulations are consistent with her view that the Act permits a state to extend assistance under its waiver program to a subgroup of the relevant population. A state's waiver request must include a description of "the group or groups of individuals to whom the services will be offered," 42 C.F.R. Sec. 441.301(b)(3). The state plan's definition of this group must:
 
 
 47
 Be limited to one of the following target groups or any subgroup thereof that the State may define:
 
 
 48
 (i) Aged or disabled, or both.
 
 
 49
 (ii) Mentally retarded or developmentally disabled, or both.
 
 
 50
 (iii) Mentally ill.
 
 
 51
 42 C.F.R. Sec. 441.301(b)(6) (emphasis added). The regulations thus permit states to limit waiver programs to "any subgroup" of the elderly "that the State may define."
 
 
 52
 The Act expressly contemplates line-drawing within a group by allowing states to seek a separate waiver with respect to statewideness, comparability, and income and resources rules. 42 U.S.C. Sec. 1396n(c)(3). This waiver mechanism is necessary to release states from specific requirements contained in Sec. 1396a(a), among which are the income and resource rules applicable in the community. Id. Sec. 1396a(a)(10)(C)(i)(III).[4] Although none of the parties have emphasized Sec. 1396n(c)(3) as an explicit statutory sanction for the disputed aspect of Connecticut's waiver program, the Secretary's letter advising Connecticut that its court-ordered waiver amendment request was not approvable suggests that, if Connecticut wishes to include the plaintiff class in its waiver program, it could do so by exercising its option to waive its income and resource rules adopted pursuant to Sec. 1396a(a)(10)(C)(i)(III). If, however, Connecticut can secure agency approval to include the plaintiffs in the waiver program only by requesting permission to alter its income and resource rules, then Connecticut can hardly be required by statute to provide waiver services to the plaintiffs. At the least, this subsection demonstrates that the waiver program was intended by Congress to allow states to re-draw the financial eligibility requirements that would otherwise apply to their waiver programs.
 
 2. Economic Impact
 
 53
 Connecticut argues that its exclusion of the plaintiff class from its home care waiver program is a reasonable policy choice in part because the class members would be marginally more likely than the people covered by the Connecticut home care waiver to secure home care at private expense, and marginally less likely to enter a nursing home and receive Medicaid. The district court considered it unlikely that more individuals with incomes over 300% of SSI would choose to absorb the cost of home care than those with incomes below that amount, and concluded therefore that, if the program were cost-effective for the latter group, it must necessarily be cost-effective for the former.
 
 
 54
 There seems to be nothing unreasonable, however, in the Secretary's allowing Connecticut to make the assumption that people with more income are marginally more likely as a group to have the personal and family resources that would enable them to achieve home care at private effort and expense. That conclusion is not inconsistent with Detsel v. Sullivan, 895 F.2d 58 (2d Cir.1990), on which the plaintiff class relies. In Detsel, the Secretary cited fiscal concerns to justify the decision not to provide a nurse to accompany a handicapped child to school. We found that the Secretary's decision saved no money (and may even have required greater state expenditures) because the child required around-the-clock attention, Medicaid provided a nurse for the child at home, and the state would be required to provide a home tutor if the child could not attend school. Id. at 65. In the present appeal, the state will not necessarily be providing the institutional care under Medicaid for which the waiver services would be a substitution. In order to qualify for such institutional care as medically needy individuals, they would have to enter a nursing home, and that is precisely what the plaintiffs and their families are willing to make such extraordinary sacrifices to avoid.
 
 
 55
 In any event, the determination of cost-effectiveness, which is a prerequisite for agency approval of a proposed waiver program, has been delegated by Congress to state and federal agencies. Connecticut is statutorily required to determine whether its waiver program will be cost-effective, and to include an adequate assurance to that effect in any waiver request. 42 U.S.C. Sec. 1396n(c)(2)(D). Before the Secretary approves the waiver program, she must determine that the assurance is satisfactory. Id. Determinations of cost-effectiveness should be left to the expertise of the state and federal agencies that are responsible for administering the Medicaid program, as they bear political responsibility for its fairness and cost, and will be paying the bill.
 
 
 56
 It is true that Connecticut's new waiver application, submitted to the Secretary in compliance with the district court's order, includes the requisite assurance that the waiver program will be cost-effective, even with the expanded class of beneficiaries.[5] However, the new application also lowers the cap on the number of people who may receive the waiver services. The new court-mandated waiver proposal may thus afford waiver benefits to individuals with incomes above 300% of SSI, while poorer applicants will be turned away. Connecticut's original policy choice cannot be deemed unreasonable in light of Congress's expressed intention that the poorest individuals should have priority when allocating the scarce resources available for providing medical assistance to the needy. See Camacho v. Perales, 786 F.2d 32, 38 (2d Cir.1986).
 
 CONCLUSION
 
 57
 We reverse the district court's summary judgment in favor of plaintiffs and remand with instructions to grant summary judgment in favor of the defendant, dismissing the complaint.
 
 
 
 [1]
 42 U.S.C. Sec. 1396n(c)(1), in part, provides:
 The Secretary may by waiver provide that a State plan approved under this subchapter may include as "medical assistance" under such plan payment for part or all of the cost of home or community-based services (other than room and board) approved by the Secretary which are provided pursuant to a written plan of care to individuals with respect to whom there has been a determination that but for the provision of such services the individuals would require the level of care provided in a hospital or a nursing facility or intermediate care facility for the mentally retarded the cost of which could be reimbursed under the State plan.
 
 
 [2]
 The Act prohibits the Secretary from granting a waiver unless the state provides the Secretary with satisfactory assurances that:
 the average per capita expenditure estimated by the State in any fiscal year for medical assistance provided with respect to such individuals does not exceed 100 percent of the average per capita expenditure that the State reasonably estimates would have been made in that fiscal year for expenditures under the State plan for such individuals if the waiver had not been granted....
 42 U.S.C. Sec. 1396n(c)(2)(D); see also 42 C.F.R. Sec. 441.302(e).
 
 
 [3]
 Section 1396n(c)(7) authorizes not a waiver for a particular illness, but a special method of making cost estimates; Sec. 1396n(c)(9) authorizes not numerical limits, but filling vacant slots that occur when waiver participants die or become ineligible. In fact, subsection (9) was added to Sec. 1396n(c) to override a regulatory interpretation promulgated by the Secretary that had restricted the discretion of state administrators. See S.Rep. No. 99-146, 99th Cong., 2d Sess. 321-322 (1986), reprinted in 1986 U.S.C.C.A.N. 42, 288-89
 
 
 [4]
 The income and resource rules require a state plan to describe:
 the single standard to be employed in determining income and resource eligibility for all such groups, and the methodology to be employed in determining such eligibility, which shall be no more restrictive than the methodology which would be employed under the supplemental security income program in the case of groups consisting of aged, blind, or disabled individuals in a State in which such program is in effect....
 42 U.S.C. Sec. 1396a(a)(10)(C)(i)(III).
 
 
 [5]
 At oral argument, counsel for Connecticut explained that compliance with the district court's order required Connecticut to give such assurance